IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-HC-02299-M

CLARENCE ADRIAN ROYSTER,          )
                                  )
              Petitioner,         )
                                  )
        v.                        )          **ORDER**
                                  )
DORIS DAYE,                       )
                                  )
              Respondent.         )

On November 3, 2019, Clarence Adrian Royster ("petitioner"), a state inmate, filed through

counsel a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Pet. [D.E. 1]. On December

10, 2019, the court allowed the action to proceed. Order [D.E. 4]. On January 8, 2020, the case

was reassigned to the undersigned judge via a text order. On January 16, 2020, respondent filed

an answer [D.E. 7], a motion for summary judgment [D.E. 8], a statement of material facts [D.E.

9], and a memorandum in support [D.E. 10]. On January 27, 2020, petitioner filed a response in

opposition [D.E. 11], and an opposing statement of material facts [D.E. 12].

For the following reasons, the court GRANTS respondent's motion for summary judgment.

### Background:

The facts of petitioner's criminal case were summarized on direct appeal as follows:

On 8 July 2013, Defendant was indicted for two counts of statutory rape, incest
with a child, contributing to the delinquency of a minor, and taking indecent
liberties with a child. On 10 February 2014, Defendant was indicted for giving
alcoholic beverages to a person under the age of 21 years old. On 30 December
2016, Defendant filed a "Motion to Dismiss for Failure to Provide Defendant with
a Speedy Trial, Untimely and Incomplete Discovery and Due Process Violations."
After a 3 January 2017 hearing, the trial court denied the motion. The trial
commenced the same day. During a morning recess, Defendant indicated he would
plead no contest to one count of statutory rape. After Defendant entered his plea

and the State dismissed the remaining charges, the trial court sentenced Defendant to 240 to 348 months of imprisonment.

State v. Royster, 258 N.C. App. 566, 811 S.E.2d 245 (unpublished table opinion); see also Pet. Attach. [D.E. 1-1] at 205–08 (indictments); id. at 210–12 (Pet'r's Dec. 30, 2016, Mot. to dismiss on speedy trial grounds); id. at 52–71 (Tr. of Jan. 3, 2017, Hr'g before the Hon. Henry W. Hight denying Pet'r's pretrial Mot. to dismiss); id. at 72–168 (Tr. of Jan. 3 and 4, 2017, trial proceedings before the Hon. Henry W. Hight); id. at 169–186 (Tr. of guilty plea and plea colloquy); id. at 186–87 (Tr. of sentencing); id. at 187–91 (Tr. of jury dismissal); id. at 191–95 (sex offender Hr'g Tr.); id. at 218–19 (Pet'r's prior record worksheet); id. at 220–23 (Tr. of plea); id. at 224–25 (J. and commitment form); id. at 226 (Judicial findings and Order for sex offenders).

Petitioner directly appealed. Pet. Attach. [D.E. 1-1] at 227–28. On March 20, 2018, the North Carolina Court of Appeals ("Court of Appeals") dismissed the appeal in an unpublished table opinion. Royster, 258 N.C. App. 566, 811 S.E.2d 245; see [D.E. 1-1] at 287–91 (printout of Court of Appeals decision). On May 9, 2018, the North Carolina Supreme Court denied a petition seeking discretionary review. State v. Royster, 371 N.C. 115, 813 S.E.2d 250 (2018).

On May 6, 2019, petitioner mailed a Motion for Appropriate Relief ("MAR") seeking post-conviction relief in Vance County Superior Court. Pet. Attach. [D.E. 1-1] at 1–38 (Pet'r's MAR). An evidentiary hearing on the MAR was held on August 28 and 29, 2019. Pet. Attach. [D.E. 1-2] at 2–248 (MAR Hr'g Tr. before the Hon. John M. Dunlow).

On September 4, 2019, the MAR court issued an order describing the underlying offense conduct as follows:

> The conduct that gave rise to [petitioner's] charges herein is alleged to have occurred on June 25, 2013 and the [petitioner's] 14 year old niece, (hereinafter "Victim"), is the alleged victim of the [petitioner's] conduct.
>
> The Victim's mother, Shawn Page, is [petitioner's] sister.

2

The following facts were not disputed:

a. Prior to June 25, 2013, [petitioner] had not really been an active part of the Victim's life; and

b. On June 25, 2013, [petitioner] picked the Victim up from her home shortly after noon; and

c. After picking up the Victim, [petitioner] took her to George's Restaurant in Oxford, North Carolina, where they ate lunch; and

d. [Petitioner] was, at that time, employed as the Manager of George's Restaurant; and

e. [Petitioner] and Victim arrived at George's Restaurant between 12:30 p.m. and 1:00 p.m.; and

f. After having lunch at George's, [petitioner] drove the Victim, in his black Dodge Ram truck, to Henderson, North Carolina; and

g. Once in Henderson, North Carolina, [petitioner], with the Victim in his truck, stopped at "Beyond Fantasy", an adult erotica store; and

h. [Petitioner] entered "Beyond Fantasy" and made a purchase; and

i. The Detailed Transaction List from Beyond Fantasy (States' Exhibit 4 MAR) tends to show that at 3:38 p.m. [petitioner] purchased a "stimulating egg" (referred to as a vibrator); and

j. After leaving Beyond Fantasy, [petitioner], with the Victim still in his truck, drove to the ABC store, where, at 3:46 p.m., the [petitioner] purchased two bottles of liquor; and

k. After leaving the ABC store, [petitioner], with the Victim still in his truck, drove to the Sleep Inn Hotel, where, at 3:59 p.m., [petitioner] rented room 212 in the name of Clarence Royster; and

l. At some point later that evening, [petitioner] returned the Victim to her home; and

m. On June 26, 2013, the Victim reported to Detective Simmons and Sergeant Feingold, both of the Henderson Police Department, the following facts:

    i. while in the hotel room, [petitioner] had taught the Victim to play drinking games and she had become intoxicated; and

    ii. [Petitioner] covered her eyes with an unknown object and began taking off her clothes; and

3

iii. [Petitioner] then began using a
vibrator on her by inserting it in and
out of her vagina; and

iv. After a few minutes, [petitioner]
kissed and licked her vagina; and

v. [Petitioner] spread her legs open
and stuck his penis in her vagina and
started having sex; and

vi. At one point, [petitioner] had the
Victim suck his penis; and

vii. [Petitioner] and Victim left the
hotel around 9:00 p.m. through the
back exit and the Victim returned to
her home around 10:00 p.m.

While the State's evidence tended to show [petitioner] returned the Victim to her home around 10:00 p.m., [petitioner] testified that he returned the Victim to her home between 8:00 p.m. and 9:00 p.m.

Certain items of the Victim's clothing were seized as evidence, and a sexual assault evidence collection kit from the Victim was completed.

See Pet. Attach. [D.E. 1-3] at ¶¶2–6. Upon consideration of the record and the testimony presented in the hearing, the MAR court denied petitioner's MAR on the merits. Id. at 1–13.

Petitioner then sought a writ of certiorari in the North Carolina Court of Appeals. See Pet. Attach. [D.E. 1-6] at 1–27. The State opposed the petition. See Pet. Attach. [D.E. 1-7] at 1–26. On October 31, 2019, the North Carolina Court of Appeals summarily denied the petition for a writ of certiorari. See Pet. Attach. [D.E. 1-8] at 1. Petitioner then filed the instant habeas petition.

Petitioner had the following legal representation: retained attorney Yolanda Feimster immediately before and after petitioner's arrest; retained attorney Michael Waters for approximately two months pretrial; court appointed attorney Michael Rogers ("Attorney Rogers") for the remainder of the pretrial duration, all trial proceedings, and for the filing of the notice of appeal; and retained attorney Patrick Michael Megaro for the remainder of the appeal, the MAR, and the instant habeas petition. See Pet. [D.E. 1] at ¶¶21–22, 32; Pet. Attach. [D.E. 1-2] at 31–33.

4

<u>Legal Standard</u>:

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, <u>Anderson</u>, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (alteration and internal quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. <u>Anderson</u>, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court cannot grant habeas relief in cases where a state court considered a claim on its merits unless (1) the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or (2) the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). A state court decision is "contrary to" Supreme Court precedent if it either "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to the Supreme Court's result. <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000). A state court decision involves an "unreasonable application"

5

of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also White v. Woodall, 572 U.S. 415, 419–427 (2014).

> [Section 2254(d)] does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000) (en banc), cert. denied, 534 U.S. 830 (2001).

Federal courts apply a highly deferential standard of review under 28 U.S.C. § 2254(d) and (e). See Dunn v. Madison, 138 S. Ct. 9, 11 (2017) (per curiam), reh'g denied, 138 S. Ct. 726 (2018); Cullen v. Pinholster, 563 U.S. 170, 181 (2011). Congress intended the standard outlined in AEDPA to be "difficult to meet." See Woodall, 572 U.S. at 419 (citation and internal quotation marks omitted). "A habeas petitioner meets this demanding standard only when he shows that the state court's decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Madison, 138 S. Ct. at 11 (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). Moreover, a state court's factual determination is presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010).

### Discussion:

The instant petition raises three grounds for relief: 1) the MAR court's decision denying post-conviction relief on petitioner's claims–that he received ineffective assistance of trial counsel and his plea was not knowing and voluntary–was contrary to clearly-established law; 2) the MAR court's decision was based on an unreasonable interpretation of the facts that were presented in the

6

MAR hearing; and 3) the MAR court's finding that petitioner's speedy trial claim was not cognizable on direct appeal was contrary to clearly-established law. See Pet. [D.E. 1].

1) Petitioner's First Ground for Relief:

In support of his first ground for relief, petitioner contends that Attorney Rogers was constitutionally ineffective when he failed adequately to investigate the facts of the case, failed to speak with available witnesses, failed to adequately prepare a defense, and failed to advise petitioner that accepting a no contest plea would extinguish petitioner's right to appeal the denial of the pretrial motion to dismiss on speedy trial grounds. See Pet. [D.E. 1] at 20–27.

To state a claim of ineffective assistance of counsel, petitioner must show that his attorney's performance fell below an objective standard of reasonableness and that he suffered prejudice as a result. Strickland v. Washington, 466 U.S. 668, 687–916 (1984). When determining whether counsel's representation was objectively unreasonable, a court must be "highly deferential" to counsel's performance and must attempt to "eliminate the distorting effects of hindsight." Id. at 689. Therefore, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. Prejudice is demonstrated by showing there is a "reasonable probability" that, but for the counsel's deficiency, "the result of the proceeding would have been different." Id. at 694.

When a party claims a counsel's deficient performance deprived him of a trial by causing him to plead guilty, "the defendant can show prejudice by demonstrating a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and insisted on going to trial." Lee v. United States, 137 S. Ct. 1958, 1965 (2017) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)). "[T]o obtain relief on this type of claim, a petitioner must convince the court that a decision to

7

reject the plea bargain would have been rational under the circumstances." See Padilla v. Kentucky, 559 U.S. 356, 372 (2010) (citation omitted).

Prior to trial, Attorney Rogers secured petitioner a favorable plea offer of two consecutive sentences of 60-132 months' imprisonment in exchange for a guilty plea to two charges of second-degree rape but, during a hearing scheduled for acceptance of the plea, petitioner rejected the plea and was arraigned. See Pet. Attach. [D.E. 1-1] at 39–45 (Dec. 5, 2016, Arraignment Hr'g before the Hon. G. Wayne Abernathy noting petitioner's rejection of plea offer); Pet. Attach [D.E. 1-3] at ¶45 (order denying Pet'r's MAR, finding: "[Petitioner's] case was placed on the docket, for plea, and [petitioner] appeared before the Hon. Wayne Abernathy on December 5, 2016. At that time, the [petitioner] chose to reject the plea that was offered by the state, and [petitioner] was questioned about his decision in open court, on the record. Thereafter, [petitioner's] matters were set for trial during the January 3, 2017 term of Vance County Superior Court.").

On December 30, 2016, Attorney Rogers filed a pretrial motion to dismiss and a motion *in limine*. See Pet. Attach. [D.E. 1-1] at 53 (Pet'r's pretrial Mot. to dismiss). Although these motions ultimately were denied, Attorney Rogers ably argued the issues during the pretrial hearing on January 3, 2017. See id. at 52–71 (Tr. of Jan. 3, 2017, Hr'g before the Hon. Henry W. Hight denying Pet'r's pretrial Mot. to dismiss). At trial, Attorney Rogers regularly raised objections, several of which were sustained. See, e.g., id. at 85, 86, 89, 92, 93–94, 96, 102, 103, 117, 119, 121, 122, 144, 145, 147, 148, 150 (trial Tr.). In short, the record belies any claim that Attorney Rogers was constitutionally ineffective for failing to make motions or raise objections, generally.

a) Failure to Investigate:

The court now turns to petitioner's claim that Attorney Rogers failed to investigate the facts of the case, speak with available witnesses, and prepare a defense. See Pet. [D.E. 1] at 21.

8

Petitioner specifically asserts that Attorney Rogers: 1) failed to obtain DNA evidence that the State intended to use at trial; 2) failed to contact witnesses that could offer exculpatory testimony that the complainant's mother had a motive to fabricate the charges against him; 3) failed to develop evidence that the complainant's mother had a history and reputation of fabrication; and 4) failed to develop evidence that petitioner previously had rented hotel rooms, not for himself, but for the benefit of friends. See id. at 21–27. The MAR court considered these contentions on merits.

As to the analysis of the DNA evidence, MAR court found:

On September 21, 2015, the [North Carolina State] Crime Lab completed their examination of certain items that had been submitted for STR/DNA analysis and prepared a report, signed by Sharon R. Hinton, Forensic Scientist, detailing the results of that examination. This report will hereafter be referenced as "DNA Report." The results of the DNA Report found, "The DNA profile obtained from the sperm fraction of the vaginal swab [from Victim] is consistent with a mixture of two contributors. The predominant DNA profile matches the DNA profile obtained from [the victim]. The DNA profile obtained from [petitioner] cannot be excluded as a contributor to the mixture." The DNA Report went on to report, "The chance of randomly selecting an unrelated individual who would be expected to be included for the observed DNA mixture obtained from the sperm fraction of the vaginal swabs is approximately: NC Caucasian: 1 in 51.0 million; NC Black: 1 in 122 million; NC Lumbee Indian: 1 in 5.69 million; NC Hispanic: 1 in 14.7 million." The results of the DNA Report were consistent with, and tended to corroborate, the allegations made by the Victim. The State timely provided a copy of the DNA Report to [Attorney] Rogers, thereafter, [Attorney] Rogers provided [petitioner] with a copy of that report. In addition, [Attorney] Rogers met with [petitioner] to discuss the results of the DNA Report and how the DNA Report results affected the overall defense strategy in the case. On June 27, 2016, [Attorney] Rogers sought, and obtained, an Order from the Court for funds to retain an expert, Dr. Maher Noureddine, to review the Crime Lab's analysis of the DNA and assist defense counsel with respect to the DNA evidence. [Attorney] Rogers provided Dr. Noureddine with copies of all the discovery material that [Dr. Noureddine] wanted to review. Following Dr. Noureddine's review of the discovery material, he gave an oral report to [Attorney] Rogers. Dr. Noureddine's oral report, in sum, corroborated the findings of the Crime Lab. Dr. Noureddine did provide [Attorney] Rogers with information that could be used to cross-exam the state's DNA expert and potentially cast doubt on the strength of the DNA evidence.

Pet. Attach. [D.E. 1-3] at ¶¶28–34 (order denying Pet'r's MAR); see also Pet. Attach. [D.E. 1-2] at 166–68 (Attorney Rogers' MAR Hr'g direct testimony that he had "provided everything that

[the defense expert witness] needed so that he could perform his analysis"; that Attorney Rogers obtained an "oral report" from the expert witness; that Attorney Rogers discussed the "oral report" with petitioner; that the expert told Attorney Rogers "orally that the State Crime Lab . . . had not taken into account that fact that [petitioner] and [the complainant] were related"; that the expert opined that, "when confronted with biological relation not having been considered by the State Lab the analyst would not have been able to do the proper math with regard to the ratio to not exclude the defendant on the stand"; that this trial strategy "may throw some doubt by way of the jury onto the actual ratio with regard to the DNA analysis"; and that the expert witness "prepared a written report that he and [Attorney Rogers] arranged that would be delivered during the week of trial"; but that that Attorney Rogers did not plan to call the defense expert witness to the stand because he "would have corroborated State Lab's [DNA] findings even with the correction"); see also id. at 190–92 (Attorney Rogers' cross-examination testimony, that, although the defense expert noted that the State's examiner had not accounted for biological relation between petitioner and complainant and would be unable to calculate "the appropriate ratio on the stand," the defense expert also "said on the phone if he was on the stand, he would say it was [petitioner].").

The MAR court also found that, contrary to petitioner's assertion, Attorney Rogers "provided [petitioner] with copies of all discovery, and kept the [petitioner] informed as to the status of the case during the course of representation." Pet. Attach. [D.E. 1-3] at ¶41; see also Pet. Attach. [D.E. 1-2] at 92–94 (petitioner's testimony on cross examination at the MAR hearing that petitioner had received the DNA report from the state and reviewed it with Attorney Rogers, that Attorney Rogers received funds to hire a DNA expert witness, but expressing uncertainty if the expert witness had a chance to review petitioner's medical records by January 3, 2017).

The court now turns to petitioner's assertion that Attorney Rogers failed to contact witnesses who could offer testimony that the complainant's mother and petitioner's sister, Shawn Page, had a motive to fabricate the charges against him. During the MAR hearing, Jenna Stewart ("Stewart"), petitioner's former restaurant co-worker, testified about an incident where Shawn Page came to petitioner's workplace. See [D.E. 1-2] at 117–134. Stewart testified that, prior to petitioner's arrest in late June 2013, petitioner's sister came to the restaurant and asked to speak with petitioner by name. Id. at 120. Stewart testified that she saw petitioner speaking with Shawn Page and overheard her asking petitioner for money and that, "to every single demand she made, [petitioner] would say no." Id. at 122. Stewart described the tenor of the conversation as "agitated, brusque . . . very irritated" and as "loud" and "elevated." Id. When asked whether she overheard "any allegations concerning any sort of sexual misconduct," Stewart responded, "no." Id. at 123. Stewart testified that the conversation lasted approximately five to seven minutes. Id. On cross examination, Stewart testified that she could not recall the nature of any of Shawn Pages' three or four requests of petitioner other than a request for money. Id. at 125–26. Stewart also testified that she believed the conversation happened "four or five" days before petitioner's arrest. Id. at 131. Stewart further testified that petitioner had her phone number and that, if petitioner had asked her to come to testify at petitioner's trial, she would have done so. Id. at 133–34.

Attorney Rogers testified in the MAR haring that petitioner had informed Attorney Rogers that Stewart could provide testimony regarding this confrontation. Id. at 179. Attorney Rogers testified, "[petitioner] told me about what [Stewart] had allegedly seen. And when we talked about it, to the best of my recollection[,] it was in between . . . after June 25th [alleged offense date] but before June 28th [petitioner's arrest date]." Id. Attorney Rogers informed petitioner that:

> the jury might interpret [that conversation] in ways other than what [petitioner] might think they would interpret it as. It could do more harm than it would help

11

because it all came down to the lab reports, the receipts, and what happened in the hotel room where they were in there alone.

Id. at 179–180.

> As to this restaurant encounter between petitioner and Shawn Page, the MAR court found:

> During one of their meetings, [petitioner] told [Attorney] Rogers that the prosecuting Victim's mother, Shawn Page, had come to George's restaurant one day and demanded a job and/or money from [petitioner]. [Petitioner] told [Attorney Rogers] that when [petitioner] refused Shawn Page's demands, she became angry and loud. [Petitioner] testified that confrontation ended when [petitioner] told Shawn Page to, "F**k yourself." [Petitioner] informed [Attorney Rogers] that another employee, by the name of Jenna [Stewart], witnessed that confrontation between [petitioner] and Shawn Page. At the present [MAR] hearing, [petitioner] testified that the confrontation at George's restaurant happened before June 25, 2013. At the present [MAR] hearing, [Attorney] Rogers testified that when [petitioner] told him about the confrontation in George's restaurant, it was [Attorney] Rogers' understanding that it occurred after June 25, 2013 (date of offense), but prior to June 28, 2013 (date of [petitioner's] arrest).

Pet. Attach. [D.E. 1-3] at ¶¶ 38–40.

As to Attorney Rogers's purported failure to develop evidence that the complainant's mother, Shawn Page, had a history and reputation of fabrication, Attorney Rogers testified that in the MAR hearing that developing such evidence did not fit into Attorney Rogers's trial strategy. See Pet. Attach. [D.E. 1-2] at 196. Rather, Attorney Rogers testified, he aimed to develop testimony suggesting that either Shawn Page's husband or her sixteen-year-old son, rather than petitioner, could have been the source of the sperm. Id. at 193, 197–98. Attorney Rogers's testimony regarding this trial strategy is supported by the cross-examination of Shawn Page at trial. See Pet. Attach. [D.E. 1-1] at 127–143 (eliciting testimony about the presence of the husband and son, and establishing that the husband previously had been investigated by North Carolina Department of Social Services for allegations of sexual misconduct against the complainant).

As to Attorney Rogers's purported failure to develop evidence that petitioner previously had rented hotel rooms, not for himself, but for the benefit of friends, the MAR court found:

During one of their earlier meetings, [petitioner] provided [Attorney] Rogers with the name of Nicole Scoma, and [petitioner] told [Attorney] Rogers that he had rented the hotel room for Nicole Scoma on June 25, 2013. [Petitioner] further told [Attorney] Rogers that he had communicated with Nicole Scoma on the date in question by text messaging. [Attorney] Rogers told [petitioner] to provide [Attorney Rogers] with the text messages, but [petitioner] never provided those messages to [Attorney] Rogers. No phone records or text messages were offered in evidence at the present hearing to corroborate the existence of such communications between [petitioner] and Nicole Scoma.

Pet. Attach. [D.E. 1-3] at ¶¶36–37 (order denying Pet'r's MAR); see also Pet. Attach. [D.E. 1-2] at 180 (Attorney Rogers' MAR hearing testimony that: "[Petitioner] had mentioned the young lady Nicole [Scoma], but never gave me any contact information regarding cell number, never gave me anything off his phone to indicate where they had contact with one another during that day. He did say that she advised that she never showed up that night at the room. He had mentioned her. I told him I did not think she would necessarily have helped, because it did not necessarily look good and [petitioner] confirmed somewhat up here renting rooms for ladies or persons that may be in emotional distress, and I didn't think it would look good in front of a jury for those issues.").

The court concludes that petitioner's claims regarding Attorney Rogers's purported failure to investigate, contact witnesses, or prepare for trial are either 1) contradicted by evidence showing that Attorney Rogers was deploying deliberate trial strategy, or 2) otherwise unsupported by the record evidence. Petitioner fails to show that Attorney Rogers's decision not to seek out interviews of additional witnesses was objectively unreasonable. See Strickland, 466 U.S. at 691 (noting a trial attorney's decision not to embark on certain investigations is "assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). Additionally, as Attorney Rogers testified in the MAR hearing, the State's evidence against petitioner was "overwhelming." See Pet. Attach. [D.E. 1-2] at 176. The MAR court also found: "During the course of their meetings and discussions, [petitioner] indicated to [Attorney] Rogers

that [petitioner] was aware of the situation and expressed to [Attorney] Rogers that [petitioner] had no intention of taking this case to trial and that he wanted [Attorney] Rogers to get him the best deal possible." Pet. Attach. [D.E. 1-3] at ¶42. Petitioner has failed to rebut this factual finding by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Sharpe, 593 F.3d at 378.

Because petitioner fails to demonstrate that Attorney Rogers's representation fell below an objective standard of reasonableness or otherwise prejudiced petitioner, cf. Strickland, 466 U.S. at 687–94, petitioner also fails to demonstrate that the state court rulings on these claims reached a result contrary to, or unreasonably applied, clearly established federal law, or were based on an unreasonable determination of the facts, see 28 U.S.C. § 2254(d)-(e); Madison, 138 S. Ct. at 11; Pinholster, 563 U.S. at 181; Williams, 529 U.S. at 405, and respondent is entitled to summary judgment on this claim.

b) Extinguishment of appellate rights:

The court now turns to petitioner's contention that his plea of no contest was not knowing and voluntary because he would not have accepted the plea had Attorney Rogers informed petitioner that this plea would extinguish his right to appeal the pretrial denial of his speedy trial motion to dismiss. See Pet. [D.E. 1] at 17–20; Pet. Attach. [D.E. 1–2] at 45 (MAR Hr'g Tr.)

A criminal defendant's decision to plead guilty also must be knowing and voluntary. See Boykin v. Alabama, 395 U.S. 238, 242–43 (1969); McCarthy v. United States, 394 U.S. 459, 466 (1969); Walton v. Angelone, 321 F.3d 442, 460 (4th Cir. 2003). When assessing the validity of a guilty plea, however, courts do not lightly disregard sworn statements in a plea hearing. See Blackledge v. Allison, 431 U.S. 63, 73–74 (1977); United States v. Lemaster, 403 F.3d 216, 221 (4th Cir. 2005); Burket v. Angelone, 208 F.3d 172, 190 (4th Cir. 2000) ("[C]ourts look to the totality of the circumstances surrounding the guilty plea, granting the defendant's solemn

14

declaration of guilt a presumption of truthfulness." (citation omitted)), cert. denied, 530 U.S. 1283

(2000). Further, a transcript of plea is presumed to be correct on federal habeas review. Parke v.

Raley, 506 U.S. 20, 29–30 (1992).

The MAR court made the following findings about petitioner's pretrial speedy trial motion:

> On December 30, 2016, [Attorney] Rogers filed a Motion to Dismiss for Failure to Provide [petitioner] with Speedy Trial, Untimely and Incomplete Discovery and Due Process Violations (hereinafter "Motion to Dismiss"). [Petitioner's] case came on for trial at the January 3, 2017 term of Vance County Superior Court before the Hon. Henry W. Hight, Jr. During the morning session of court, [petitioner's] Motion to Dismiss was heard and the same was denied. Following the denial of the Motion to Dismiss, [Attorney] Rogers told [petitioner] that if the trial did not go as they hoped, the denial of the Motion to Dismiss was an issue that could be addressed in an appeal. At the time of this advice by [Attorney] Rogers, the case was in a trial posture, and that advice was not rendered in contemplation of a guilty or no contest plea by [petitioner]. Other than that comment, there were no further discussions between [petitioner] and [Attorney] Rogers about an appeal.

See Pet. Attach. [D.E. 1-3] at ¶¶ 46–48.

At the MAR hearing, petitioner testified on direct examination that, as petitioner was going

over the plea offer, he asked Attorney Rogers, "If I take this plea, can I still appeal the motion?"

and Attorney Rogers said "yes." See Pet. Attach. [D.E. 1-2] at 44. Petitioner further testified that,

when his fiancée, Louise Jeffries ("Jeffries") was present in the room, petitioner again asked

Attorney Rogers, "Can I still appeal," and the answer was "yes." Id. Petitioner testified: "Had I

known that signing that plea deal would have extinguished my right to file the motion of appeal

for the speedy trial, I would not have signed that paper." Id. at 45. On redirect, petitioner further

testified that he asked Attorney Rogers at least twice, once with Jeffries present, whether petitioner

could still appeal the speedy trial motion. Id. at 116.

Jeffries testified that Attorney Rogers usually would not speak to her directly regarding the

case because she and petitioner were not married. Id. at 138. Jeffries testified that, on the day

petitioner entered the no contest plea, however, she had a brief conversation with Attorney Rogers in a conference room with petitioner present. Id. at 137–38. Jeffries testified:

> when I first was asked to go back, [Attorney] Rogers would not talk to me during that time. [Attorney Rogers] stated that [petitioner] needed to tell me what was going on, so he stepped out. And then [petitioner] told me about the plea and then a few minutes later [Attorney Rogers] came back in. That's when they continued talking. He wasn't speaking directly to me, but I was still in the room. And [petitioner] asked a question and [Attorney Rogers] said, "You can still appeal."

Id. at 138.

When asked what question petitioner had asked that elicited Attorney Rogers's above response, Jeffries testified: "I don't remember exactly the wording, but it was in regards to being to appeal if he took the deal [sic]." Id. at 139. Jeffries further testified she had a private conversation with petitioner when Attorney Rogers was not present during which petitioner told her that petitioner "had been made aware that he could still appeal if he took the deal . . . and the one thing that [petitioner] did say was that he wouldn't take the deal unless he could appeal." Id.

Attorney Rogers, by contrast, testified he would not allow Jeffries in the room to review discovery "because there was no relationship there that gave any privilege" and this was his general approach to meeting with all clients when reviewing evidence. Id. at 157–58. As to the plea offer, Attorney Rogers testified that, in a bench conference, the District Attorney advised him that the State would extend a plea deal of an active sentence of approximately 20 years but, "once [the complainant] was sworn in to testify, there would be no further offers of negotiation, and that the State would seek the maximum sentence on any convictions that may come back from the jury." Id. at 171. Attorney Rogers testifies he met with petitioner in a conference room and petitioner "indicated that he would be willing to enter a no contest plea." Id. Attorney Rogers then went over the transcript of plea with petitioner and testified he followed his usual method of asking a defendant to answer yes or no, and "read the questions verbatim as they are shown." Id. at 172.

16

Attorney Rogers testified that only he and petitioner were in the room at the time "because [petitioner] was not married and [Attorney Rogers] wanted to keep all theses issues and evidence against him confidential." Id. at 173. As to whether he and petitioner discussed an appeal, Attorney Rogers testified that, when the speedy trial motion was denied the prior day, he told petitioner, "'That is an issue that an be addressed on appeal.' But at that point we were still going forward in the trial." Id. at 174. Asked if, on "the day [Attorney Rogers was] filling out the transcript of plea with [petitioner], did [petitioner] talk to you about how this plea would affect his right to appeal," Rogers stated, "No. This was never discussed about an appeal once we were doing this plea." Id. at 174. Asked if, on the date the plea was entered, petitioner's fiancée Jeffries talked to him about appealing and how the plea would affect petitioner's appeal, Attorney Rogers responded, "No." Id. at 174–75. Attorney Rogers then testified that he specifically read petitioner that part of the plea transcript that stated, "Do you understand that following a plea of guilty or no contest there are limitations on your right to appeal," and petitioner responded, "yes." Id. at 175. When asked whether, petitioner "had in his mind that he wanted to appeal the ruling on the motion to dismiss . . . with regards to speedy trial, did [petitioner] ever share that with you on January the 4th," the date the plea was entered, Attorney Rogers responded, that petitioner did not. Id. When asked whether Attorney Rogers ever gave petitioner "specific advice . . . as to the effect of this plea on his right to appeal the denial of the motion to dismiss with regards to speedy trial," Attorney Rogers responded, "No, that was never talked about with regards to entering this plea." Id. at 176.

On cross examination, in response to whether Attorney Rogers discussed an appeal on the date the plea was entered, Attorney Rogers stated, "we did not discuss anything about an appeal once we started doing the plea transcript." Id. at 201. When asked whether Attorney Rogers informed petitioner at the time of filling out the plea transcript that, "by the way accepting this

17

now extinguishes your right to challenge the speedy trial denial on appeal," Attorney Rogers responded, "I do not remember saying that to [petitioner]." Id.

> After considering these discrepancies in the hearing testimony, the MAR court found:

> [Petitioner] testified, at the present [MAR] hearing, that at all times relevant to the entry of the plea of no contest, it was his intention to appeal the denial of the motion to dismiss for failure to provide a speedy trial. At no point on January 4, 2017 did [petitioner] inform [Attorney] Rogers that he intended to appeal the denial of the Motion to Dismiss. At no point on January 4, 2017 did [petitioner] ask [Attorney] Rogers whether he could still appeal the denial of the Motion to dismiss in light of the no contest plea. At no point on January 4, 2017 did [Attorney] Rogers offer advice as to whether [petitioner] could still appeal the denial of the speedy trial motion if [petitioner] plead no contest.

Pet. Attach. [D.E. 1-3] at ¶¶ 61–63. As noted above, such MAR court factual determinations are presumed correct on federal habeas review. See 28 U.S.C. § 2254(e)(1); Sharpe, 593 F.3d at 378.

The record reflects that, during his plea colloquy, petitioner swore that: Attorney Rogers had explained the charges to him; he and Attorney Rogers discussed possible defenses; he was satisfied with Attorney Rogers's service; his no contest plea carried with it a waiver of certain rights, including the right to a jury trial and limitations on his right to appeal; his no contest plea to statutory rape was part of an agreement that included the dismissal of charges; he understood the maximum and minimum penalties associated with his plea; his no contest plea would be treated as "being guilty" whether or not petitioner admitted his guilt; he personally accepted the plea agreement and entered it of his free will; no one had made him any promises or threatened him to cause him to enter the plea agreement against his wishes; and there were facts to support the plea. See Pet. Attach. [D.E. 1-1] at 171–176. Petitioner stipulated to the State's factual basis for the plea. Id. at 176–79. Petitioner agreed that the calculated compensation fees were reasonable for Attorney Rogers's efforts and did not object to reimbursing the State. Id. at 184–85. The trial judge found there was a factual basis for the plea; petitioner was satisfied with Attorney Rogers's

18

counsel; petitioner was competent; and petitioner's plea was an informed choice and was made freely, voluntarily, and understandingly. Id. at 186.

> Considering both the plea colloquy and the MAR hearing testimony, the MAR court found:

> At the time of the entry of the plea of no contest, [petitioner] was fully informed as to the potential punishments if convicted by the jury; fully informed as to the evidence likely to be submitted by the State against [petitioner]; fully informed as to the theory of defense formulated by [Attorney] Rogers with the assistance of Dr. Noureddine; and fully capable of weighing the pros and cons of accepting the plea arrangement versus the risks associated with a trial by jury. [Petitioner] was not misled into accepting the plea arrangement by any promise by [Attorney] Rogers that [petitioner] retained his right to appeal the denial of the Motion to Dismiss.

Pet. Attach. [D.E. 1-3] at ¶¶ 74–75. As noted above, such MAR court factual determinations are presumed correct on federal habeas review. See 28 U.S.C. § 2254(e)(1); Sharpe, 593 F.3d at 378.

The record further reflects that, if petitioner instead had been convicted at trial of all charges, he faced a minimum sentence of 32 years and possible maximum of two consecutive life sentences without parole plus an additional term of years. See Pet. Attach. [D.E. 1-1] at 221–23, [D.E. 1-2] at 241. Moreover, as noted above, Attorney Rogers testified that the State's evidence against petitioner was "overwhelming," Pet. Attach. [D.E. 1-2] at 176, and that the defense's own expert witness's findings corroborated the State's DNA laboratory results, id. at 166–67, 190–92.

After considering the strength of the State's evidence and the great length of petitioner's possible sentence if convicted on all counts, the court is not convinced that an objectively reasonable petitioner would have rejected the favorable plea bargain of 240 to 348 months' imprisonment regardless of whether that plea foreclosed that petitioner's appeal of the pretrial denial of his speedy trial motion. See Padilla, 559 U.S. at 372.

In sum, petitioner fails to demonstrate that Attorney Rogers's representation fell below an objective standard of reasonableness or otherwise prejudiced petitioner. Cf. Strickland, 466 U.S. at 687–94. Further, because petitioner is bound by his sworn admissions in the plea colloquy, see

19

Blackledge, 431 U.S. at 73–74, because the transcript of plea is presumed to be correct on federal habeas review, see Parke, 506 U.S. at 29–30, and because the court is unconvinced that a reasonable petitioner would have declined the favorable plea agreement, Padilla, 559 U.S. at 372, petitioner also fails to demonstrate that his plea of no contest was not knowing and voluntary, cf. Boykin, 395 U.S. at 242–43. Thus, petitioner fails to demonstrate that the state-court rulings as to these claims either reached a result contrary to, or unreasonably applied, clearly established federal law, or were based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)-(e); Madison, 138 S. Ct. at 11; Pinholster, 563 U.S. at 181; Williams, 529 U.S. at 405. Accordingly, respondent is entitled to summary judgment on this claim. See Anderson, 477 U.S. at 249.

2) Petitioner's Second Ground for Relief:

In support of his second ground for relief, petitioner specifically asserts that the following MAR court findings are not supported by the record:

> 32. On June 27, 2016, [Attorney] Rogers sought, and obtained, an Order from the Court for funds to retain an expert, Dr. Maher Noureddine, to review the Crime Lab's analysis of the DNA and assist defense counsel with respect to the DNA evidence.
>
> 33. [Attorney] Rogers provided Dr. Noureddine with copies of all the discovery material that he [Dr. Noureddine] wanted to review. Following Dr. Noureddine's review of the discovery material, he gave an oral report to [Attorney] Rogers.
> …
> 48. Following the denial of the Motion to Dismiss, [Attorney] Rogers told [petitioner] that if the trial did not go as they hoped, the denial of the Motion to Dismiss was an issue that could be addressed in an appeal. At the time of this advice by [Attorney] Rogers, the case was in a trial posture, and that advice was not rendered in contemplation of a guilty or no contest plea by [petitioner]. Other than that comment, there were no further discussions between [petitioner] and [Attorney] Rogers about an appeal.
> …
> 54. Specifically, [Attorney] Rogers read question #10 to [petitioner] which read, "Do you understand that following a plea of guilty or no contest there are limitations on your right to appeal?" To that question, [petitioner] answered "Yes." There was no further discussion or questions by the [petitioner] with respect to question #10 or his right to appeal.

20

55. While preparing the Transcript of Plea form, [Attorney] Rogers read question #26 to [petitioner], which read, "Do you have any questions about what has just been said to you or about anything else connected to your case?" To that question, the [petitioner] answered "No." There was no further discussion or questions for [Attorney] Rogers by [petitioner] with respect to his right to appeal.

…

62. At no point on January 4, 2017 did [petitioner] ask [Attorney] Rogers whether [petitioner] could still appeal the denial of the Motion to Dismiss in light of the no contest plea.

…

71. The performance of trial counsel in representing the [petitioner] was within the range of competency demanded of attorneys in criminal cases.

72. [Petitioner] has failed to show that [Attorney] Rogers' performance, as counsel for the [petitioner], was deficient.

Pet. [D.E. 1] at ¶92 (quoting order denying Pet'r's MAR, Pet. Attach [D.E. 1-3] at ¶¶ 33, 48, 54–55, 62, 71–72).

Petitioner asserts the MAR court's decision ignored the hearing testimony of petitioner's restaurant co-worker, Stewart, and petitioner's fiancée, Jeffries. See Pet. [D.E. 1] at ¶93.

Petitioner also asserts that Attorney Rogers's representations as to lab reports during the pretrial motions hearing contradicts the MAR court's findings. See id. at ¶¶95–96. Petitioner specifically cites to Attorney Rogers's following statement during the pretrial motion hearing:

One of the reasons I don't have a written report is we don't have any of the collection techniques or what was done, in particular, by the SANE nurse when the search warrant was executed on the person of [petitioner]. And the order says that Duke is to provide them the State, and then through discovery I would also get them and be able to provide them to my court-appointed expert, which I have yet to receive as of this point, and as of Friday when I filed this motion. I can say, Judge, my expert has requested those to be able to provide me a proper opinion with regard to his assessment of what was sent to the State lab.

Pet. Attach. [D.E. 1-1] at 59 (Tr. of Jan. 3, 2017, Hr'g before the Hon. Henry W. Hight denying Pet'r's pretrial Mot. to dismiss); but see [D.E. 1-2] at 166–168 (Attorney Rogers' MAR Hr'g direct testimony regarding the DNA evidence and the expert witness).

21

In his memorandum in opposition to respondent's motion for summary judgment, petitioner asserts that, because MAR court's factual findings are objectively unreasonable, there are issues of material fact that preclude summary judgment. See Pet'r's Resp. [D.E. 11] at 4–5.

The court addressed many of these purported discrepancies between the the MAR court's factual findings and the MAR hearing testimony in its discussion of petitioner's first ground for relief, and the MAR court's decision is presumed to be a judgment on the merits. See Harrington, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); see also Wright v. Angelone, 151 F.3d 151, 156–57 (4th Cir. 1998) (rejecting argument that summary dismissal by state court is not an adjudication subject to AEDPA standard on habeas review).

As noted above, the MAR court's factual findings are presumed correct on federal habeas review and, despite petitioner's claims, petitioner has failed to rebut these finding by "clear and convincing evidence." See 28 U.S.C. § 2254(e)(1); Sharpe, 593 F.3d at 378. Petitioner also has not met the "difficult" ADEPA standard of showing that the MAR court's "decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Madison, 138 S. Ct. at 11; see Woodall, 572 U.S. at 419; Harrington, 562 U.S. at 103. Although petitioner plainly disagrees with the factual findings of the MAR court, petitioner fails to demonstrate that the MAR decision was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)-(e); Madison, 138 S. Ct. at 11; Pinholster, 563 U.S. at 181; Williams, 529 U.S. at 405. Accordingly, because the court finds that there are no issues of material fact for trial as to this issue, respondent likewise is entitled to summary judgment on petitioner's second ground for relief. See Anderson, 477 U.S. at 249.

3) Petitioner's Third Ground for Relief

The court now turns to petitioner's third ground for relief–that state courts' findings that petitioner's speedy trial claim was not cognizable on direct appeal was contrary to clearly-established law. See Pet. [D.E. 1] at 33–37.

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI.

Here, petitioner raised a "speedy trial" claim on direct appeal. The North Carolina Court of Appeals found:

> [Petitioner's] contention that the trial court erred in denying his motion to dismiss is not cognizable on appeal from a guilty plea. "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." State v. Reynolds, 298 N.C. 380, 395, 259 S.E.2d 843, 852 (1979) (quoting Tollett v. Henderson, 411 U.S. 258, 267, 36 L.Ed. 2d 235, 243 (1973)), cert. denied, 446 U.S. 941, 64 L.Ed. 2d 795 (1980).

Royster, 258 N.C. App. 566, 811 S.E.2d 245.

Although petitioner attempts to rely upon Class v. United States, 138 S. Ct. 798 (2018), see Pet. [D.E. 1] at 34–37; Pet'r's Resp. [D.E. 11] at 4–5, this reliance is misplaced. Class held that a federal criminal defendant's guilty plea does not itself bar a defendant "from challenging the constitutionality of the statute of conviction on direct appeal." Class, 138 S.Ct. at 803. The United States Court of Appeals for the Fourth Circuit, however, has foreclosed the extension of the Class holding to a defendant's attempt to raise a speedy trial claim after a guilty plea. See United States v. Lozano, 962 F.3d 773, 778–80 (4th Cir. 2020) (discussing Class and concluding a defendant's speedy trial claim is foreclosed by a guilty plea); see also United States v. Fitzgerald, 820 F.3d 107, 110 (4th Cir. 2016) ("It is the general rule that when a defendant pleads guilty, he waives all

non-jurisdictional defects in the proceedings conducted prior to entry of the plea, and thus has no non-jurisdictional ground upon which to attack that judgment except the inadequacy of the plea.").

The court finds that, because petitioner may not rely upon Class, petitioner likewise fails to demonstrate that the state courts' rulings–that petitioner's no contest plea waived his "speedy trial" claim–reached a result contrary to, or unreasonably applied, clearly established federal law, or otherwise were based on an unreasonable determination of facts. See 28 U.S.C. § 2254(d)-(e); Madison, 138 S. Ct. at 11; Williams, 529 U.S. at 405. Accordingly, respondent is entitled to summary judgment on petitioner's third ground for relief.

Finally, because reasonable jurists would not find the court's treatment of any of these claims debatable or wrong, and because none of the issues are adequate to deserve encouragement to proceed further, the court also will deny a Certificate of Appealability. See 28 U.S.C. § 2253(c); Miller-El v. Cockrell, 537 U.S. 322, 336–38 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000).

### Conclusion:

For the reasons discussed above, the court: GRANTS respondent's motion for summary judgment [D.E. 8]; DISMISSES the petition for a writ of habeas corpus [D.E. 1]; DENIES a Certificate of Appealability; and DIRECTS the clerk to close the case.

SO ORDERED. This 30th day of September 2020.

RICHARD E. MYERS II
United States District Judge

24